(No. 91-CC-0088– )

SANDRA STACY, Claimant, *v.* THE BOARD OF GOVERNORS OF STATE COLLEGES AND UNIVERSITIES, Respondent.

*Opinion filed September 15, 1995.*

*Order on petition for rehearing filed November 30, 1995.*

LONNY BEN OGUS, for Claimant.

DUNN, GOEBEL, ULBRICH, MOREL & HUNDMAN (MARK T. DUNN, of counsel), for Respondent.

## OPINION

FREDERICK, J.

Claimant, Sandra Stacy, filed her complaint in the Court of Claims seeking fifty thousand dollars ($50,000) for loss of income she claims is due her for wrongful termination from Governors State University. Claimant alleges that she was employed by Governors State University from January 2, 1986, until August 14, 1987, as Director of Career Planning and Placement. Claimant further alleges that she was wrongfully terminated without cause, in violation

of regulations and the administrative and professional personnel handbook. The Respondent, in its answer, averred that the Board of Governors of State Colleges and Universities was the only entity with statutory power to make rules, regulations and bylaws for the government and management of the five universities which the board operates. The answer further admitted that at the time of the decision not to retain her, Claimant was an administrative employee of the board of Governors State University known as a category A, level IV administrative employee. The Respondent avers that Claimant served at the pleasure of the GSU President and, unless terminated for cause, was entitled only to the notice prescribed in paragraph 5d(1), (2) and (3) of the Board of Governors Regulations. The board admits Claimant was not terminated for cause.

The cause was tried before the Commissioner on a joint stipulation of facts. Those facts are set forth herein as follows:

On October 31, 1983, Ms. Sandra Stacy ("Stacy"), was offered a temporary appointment at Governors State University ("GSU") as a counselor/coordinator of counseling and guidance ("counselor/coordinator") in the GSU Office of Student Development. Her contract was for a term beginning November 1, 1983, and ending October 31, 1984, at a salary of $21,000. Stacy accepted that position on November 1, 1983.

Stacy's immediate supervisor was Mr. Burton Collins ("Collins"). Collins was Associate Dean for Student Development at GSU. Stacy had daily contact with Collins. As counselor/coordinator, Stacy was responsible for meeting with students individually and in groups to help them decide what their career plans would be after GSU. She also acted as the "outreach person" for faculty and other staff for the same issues.

Before or at about the time that Stacy signed her first contract, she read a document entitled *Governors State University Administrative and Professional Personnel Handbook* (October, 1980), (the "handbook"). The handbook provides, among other things, that it was developed to define the relationship of administrative and professional personnel to the university. It also provides that:

"In all cases, Board of Governors *Governing Policies and Regulations* shall prevail in the event of any contradiction or inconsistency between University policies and procedures and Board *Governing Policies and Regulations*."

The handbook has never been approved or adopted by the board. Part VI of the handbook also provides an employee evaluation process.

Part VI, paragraph D of GSU's handbook provides for employees to prepare a self-evaluation by February 1st of each year. Stacy's first self-evaluation (for the period November 1, 1983, to February 20, 1984) is dated March 5, 1984. She typed that self-evaluation and delivered it to Collins. Collins signed Stacy's self-evaluation and provided her with a positive evaluation as her supervisor. Up to that point, Stacy thought that she and Collins enjoyed a good, healthy working relationship.

On March 8, 1984, Collins recommended that Stacy be retained in her counselor/coordinator position and Stacy acknowledged that recommendation the same day. The handbook provided that "[b]y March 31, the President will notify Administrative and Professional employees of retention and non-retention decisions." However, GSU's president did not approve Stacy's retention until April 20, 1984. Stacy realized that such decisions were normally late. Stacy has testified under oath, "Within my five-year history at the university, typically that is how things were done. We were rarely on time with things such as evaluations in my five-year history with the university."

Nothing remarkable happened during the balance of Stacy's year of temporary employment.

On November 1, 1984, Stacy accepted a probationary appointment as a student development counselor and university professor of counseling in the Office of Student Development at GSU. This contract was for a term beginning November 1, 1984, and ending August 31, 1985. In signing that contract, Stacy understood that she was then a tenure track employee. Stacy's duties remained the same, but she understood that her evaluation would then be made pursuant to a collective bargaining agreement between the Board of Governors of State Colleges and Universities and the University Professionals of Illinois. As a bargaining unit employee, Stacy was required to prepare a retention folder and she was provided written guidelines about what material had to be accumulated for her to be evaluated.

During her first year of employment as a tenure track employee, Stacy kept the same duties she had as counselor/coordinator. For the period November, 1983, to November, 1984, Stacy's title remained counselor/coordinator. For the period November, 1984, until at least August, 1985, her title was outreach counselor/professor. The only practical difference was that when Stacy became a tenure track employee, she was given a professorship title. Throughout her temporary employment and her first year on tenure track, Stacy had no problems or disputes with Collins. Stacy's relationship with Collins was very good.

In 1985, Stacy learned that GSU was going to conduct a regional search for a person to fill the job of Director of Career Planning and Placement. In Stacy's view, this position was an attempt to create a new administrative division at GSU. Because the directorship was an administrative position, the person who filled the job would no longer be a union unit member. Thereafter Stacy participated in a

so-called "search and screen" process and on October 15, 1985, Collins and GSU's Dean of Student Affairs recommended Stacy for the new directorship. Up through that time, Stacy's relationship with Collins remained very good.

On October 31, 1985, GSU's president, Leon Goodman-Malamuth, appointed Stacy Director of Career Planning and Placement at GSU beginning January 1, 1986. Stacy continued as a union unit member until January 1, 1986, but, thereafter, she was no longer subject to the collective bargaining agreement. Stacy understood that during her first year of employment, her evaluations were made subject to the handbook. During the second year, her evaluations were subject to the collective bargaining agreement. After January 1, 1986, Stacy was again to be evaluated subject to the handbook.

After becoming Director of Career Planning and Placement, Collins remained Stacy's supervisor. According to Stacy, in the middle of January, 1986, shortly after she started her new position as director, her relationship with Collins changed. About that time, Stacy submitted a 34-page document to Collins outlining the work she had set up over the Christmas 1985-1986 holiday. This document included what Stacy thought Collins should be aware of in terms of progress in the area of career planning and placement. Collins had not requested this document but Stacy thought Collins should be kept abreast of what she was doing. When she delivered the document to Collins, Stacy felt that his behavior was "uncooperative."

On or about February 10, 1986, Collins wrote to Stacy asking her to meet with him to discuss her work plan agreement. The work plan agreement is described generally in the GSU handbook. The next day, Stacy sent Collins a memorandum with a draft work plan agreement.

Stacy did not meet with Collins as requested before submitting her first work plan agreement.

In February, 1986, the union wrote to the board concerning the new directorship which was then held by Stacy. Prior to that letter, the union verbally advised the board that the new directorship should be a bargaining unit position. The union's letter merely confirmed earlier oral discussions. Stacy was not originally aware of the union's position.

On February 24, 1986, Stacy submitted another copy of her draft work plan agreement. This was the same work plan agreement that Stacy had submitted to Collins on February 11, 1986.

According to Stacy, from the middle of January, 1986, until February 24, 1986, she had no disagreements or confrontations with Collins, but she felt that Collins was acting "mysterious." Because she felt Collins had "pulled back on his support," Stacy made sure that she put everything in writing. She doesn't recall discussing these circumstances directly with Collins but Stacy did have several informal discussions with fellow employees and they decided "just to make sure that we cover our butts. Make sure that we put everything in writing * * *."

On March 12, 1986, Stacy met with Collins. After that meeting, she sent another memorandum to Collins concerning their March 12th meeting. Stacy appended a third copy of her work plan agreement and copied Collins' supervisor, Dean Catherine Taylor, on her cover memorandum. Stacy intended to send a message by copying Dean Taylor. This act was a reflection of Stacy's deteriorating relationship with Collins.

Sometime about March 26, 1987, Stacy met with GSU's provost, David Curtis, Dean Taylor and Collins to

discuss her position as director. The meeting lasted about an hour. This meeting was intended to help prepare the provost to discuss whether Stacy's position would fall under the UPI or under administrative guidelines. Stacy did not care one way or another about this subject. After this meeting, Stacy prepared a job description and submitted it to Dean Taylor. On April 1, 1986, Stacy sent another memorandum to Dean Taylor concerning her administrative duties.

After the March 26, 1986, meeting, a second meeting was held at Dean Taylor's office. Taylor, Collins, Stacy and the union's representative were all present at this April 3, 1986, meeting. Stacy was present as an "observer." Taylor, Collins and Stacy all assured the union's representative that two separate work plan agreements would be prepared relating to Stacy's job as director.

On April 8, 1986, Stacy sent yet another memorandum to Collins with her attached work plan agreement. Even though Stacy had been present during two meetings about her duties as director, there was no difference between Stacy's fourth work plan submission and the first three. By that time, Stacy felt that the time period for approval of her work plan agreement had passed and that GSU's handbook had been violated. However, she did not file any sort of grievance or complaint because she did not want to "rock the boat."

On or about April 29, 1986, Stacy received a memorandum from Collins with a redrafted work plan agreement. In his memorandum, Collins explained that his redrafted plan corresponded to the "areas of responsibility which we negotiated with Dr. Charles Olson (i.e., the union's representative) regarding the conflict" between Stacy's new position as director and her previous position as a career counselor. Collins stated that Stacy's previous

drafts could not be used and asked Stacy to contact him if she had any questions. By that time, Stacy understood that GSU had been engaged in negotiations with the union to define just what her job as director could and could not properly include. However, her view remained unchanged. She thought that a work plan agreement should have already been in place as provided in the GSU handbook.

Almost one month after the April 3, 1986, meeting, on May 2, 1986, Stacy delivered a memorandum to Collins with two attached work plans. One of the attached work plans was effective through June 30, 1986, and eliminated career counseling as agreed on April 3, 1986. The second attached work plan was effective after July 1, 1986, and included career counseling. Ten days later, Stacy sent yet another memorandum to Collins together with the same material previously forwarded to him on May 12, 1986. In addition, Stacy forwarded all the foregoing memoranda directly to Collins' supervisor, Dean Taylor.

On May 22, 1986, Collins forwarded a marked-up version of Stacy's work plan agreement to Dean Taylor. In his memorandum he said, "It is my opinion that these methods are steps necessary to reorganize the office * * *." Stacy was not aware of the changes to her work plan proposed by Collins. However, on June 9, 1986, Collins wrote to Stacy advising her that the proposed work plan agreement scheduled to begin after July 1, 1986, had not been signed. Collins advised Stacy that "[i]t is the rationale of the Dean that it [i.e., the final work plan] should be delayed until September, 1986, when all other WPAs will be developed and 'problem solving or innovative goals' can be more effectively identified and developed."

Stacy was not satisfied with Collins' June 9, 1986, memorandum. She wrote directly to GSU's provost via a

June 12, 1986, memorandum. She wrote to the provost because she was startled to see that consideration of her work plan agreement would be delayed until September, 1986, and she felt the provost "could straighten it out * * *." Although Collins had asked Stacy to contact him if she had questions about his June 9, 1986, memorandum, she did not contact Collins before writing to the provost. Stacy felt that it was "impossible" to talk to Collins.

After her June 12th memorandum, Stacy was called to a meeting with the dean and Collins. This meeting took place at the dean's office from 3:15 p.m. until 5:07 p.m. Stacy says that the dean proceeded "just to scream at me about don't I have anything else better to do with my time other than write memos." According to Stacy, this meeting was an "excruciating painful experience." Stacy recalls the dean telling her that Collins was doing his best and that the message conveyed was "don't write any other memos." Stacy felt that Collins misrepresented what was really happening. She felt that she had memos to prove she had done what Collins had asked. Stacy says that she just sat back and listened and then went out to dinner.

About June 20, 1986, Stacy received a memorandum from Dean Taylor approving her work plan. Dean Taylor advised Stacy that a work plan for the academic year 1986-1987 would be developed in conjunction with the process for all administrative and professional staff after July 1, 1986. Stacy remained concerned that approval of her work plan was several months late and this made her "fearful" of how she would be evaluated.

When the 1986-1987 academic year began, Collins wrote to Stacy, David Sparks and Pam Zener concerning their work plan agreements. Sparks and Zener were counselors in the GSU learning assistance center. Collins asked that draft work plans be submitted by September

19, 1986. Stacy noted that Collins' memorandum was in direct agreement with Dean Taylor's June 20th memorandum. She concluded that Dean Taylor and Collins had decided to override the handbook.

Stacy decided not to file a grievance about this issue and complied with Collins' request. However, when Stacy submitted her work plan, it was initially not delivered to Collins. By September 25, 1986, the lost work plan was found and memoranda exchanged.

Collins reviewed Stacy's proposed work plan and sent her a memorandum suggesting changes. Collins also scheduled a meeting with Stacy for October 10, 1986. Stacy considered Collins' memorandum as "picking." She also felt that development of a work plan was "out of sync again."

On October 10, 1986, Stacy wrote yet another memorandum to Collins advising him that she was "confused" and found his "words difficult to decipher." Stacy never went to talk to Collins as he had scheduled. She just wanted to make sure she had "documentation" in writing.

On October 23, 1986, Collins provided Stacy with an example of a work plan that met his standards. Stacy marked up Collins' draft and she admits that her comments were "picking."

On October 31, 1986, Stacy sent Collins her revised work plan with a cover memorandum.

A review of Stacy's work plan demonstrates that it does not follow the format provided by Collins. Therefore, on November 12, 1986, Collins wrote to Stacy stating:

"Over the past two months, you have been provided information to assist you in the development of your 1986-1987 Work Plan Agreement. I have sent information to you that included a description of the acceptable format, a descriptive explanation for each section of the format, and an example of a completed Work Plan Agreement. I have received two drafts of a Work Plan

Agreement from you. Neither of them are acceptable since they do not set forth goal statements establishing what you expect to accomplish, and there is no indication of what is to be evaluated. Given these facts, it is apparent to me that a continuation of this interaction will not result in a Work Plan Agreement that is acceptable.

As the Associate Dean for Student Development, I am ultimately responsible for the achievements of the functional areas of the unit. Therefore, I am assigning the attached work plan to you. (See the attached Work Plan Agreement).

If you have any further questions regarding this matter, please arrange an appointment with my secretary."

After this memorandum, Stacy was not satisfied. According to her, she had "wanted to work cooperatively" on a work plan. Stacy also thought that she had to agree to a work plan. She felt that the activities from September, 1986, through November 12, 1986, did not amount to "consultation" as provided for in the GSU handbook.

On Tuesday, January 27, 1987, Collins reminded Stacy that self-evaluations were called for by the handbook by February 1st. Stacy had already started working on her self-evaluation because it was a pretty lengthy document. She didn't deliver her self-evaluation until after February 1st because that day fell on a Sunday and she felt it was acceptable to wait until Monday. Stacy's self-evaluation was delivered with a short cover memorandum.

Early in February, 1987, Collins asked Stacy for a list of individuals whom she felt could best evaluate her performance. Stacy forwarded her list on February 10, 1987, as requested. Collins decided to add some names to Stacy's list and so advised her the next day. Stacy felt the addition of new names by Collins was appropriate and some of the people listed were her "pretty close friends." According to Stacy, in her division it was more or less general knowledge that she was not getting along with Collins.

In late February, 1987, Stacy met with Collins in his office to discuss her evaluation. Their meeting lasted

about five minutes. Collins informed Stacy that he had decided not to retain her. Stacy asked why Collins was recommending her nonretention and he said it was in writing and was being typed by his secretary. He said, "I've just decided I'm not going to recommend you for retention." Given what had happened with the memos and the screaming, Stacy was not surprised.

On March 2, 1987, Collins advised Stacy in writing that her evaluation was ready for review at his office. But Stacy would not go to Collins' office because she found that to be "highly irregular." By "highly irregular" she meant that she would have felt very uncomfortable under those circumstances. At Stacy's request, she was allowed to pick up the evaluation and take it out of Collins' office.

Stacy received her written evaluation on Monday, March 2, 1987. Stacy refused to sign the evaluation because the handbook provided that supervisor evaluations were to be submitted by March 1st. March 1st was a Sunday in 1987. Stacy acknowledges that her self-evaluation was not provided until Monday, February 2, 1987. However, she would not sign off on Collins' evaluation because she considered his evaluation late. Therefore, technical parts of the original evaluation prepared by Collins had to be modified in order to satisfy Stacy.

The complete evaluation prepared by Collins is ten single-spaced pages in length. The first four pages of the Collins document analyze Stacy's self-evaluation. That analysis concludes:

"In conclusion, when the self-evaluation and the analyzed data are compared to the goals of the two work plan agreements, they are found to be related in part. Many of the stated goals and methods of achievement in both work plan agreements are not addressed in the self-evaluation. Regardless, the self-evaluation does provide information regarding many of the primary functional areas of the GSU Career Planning and Placement Office. This information reflects a low volume activity in the number of on-campus interview, appointments with employers, students, and faculty, and the number of

workshops offered. Furthermore, little or no information is provided to help determine the effectiveness of efforts to develop new job listings, participation in the job fair and the alumni outreach program, the credential forwarding service, and the number of publications developed for students. That information provided does reflect a limited number of job listings in the area of Business and Public Administration and Arts and Sciences. The majority of the listings reported correspond to areas in Education, or areas where no degree is required or no specific major is required. What is more, the Director reports she had 53 appointments with potential employers over the course of twelve months of 1.2 appointments per week, or 4.4 appointments per month. Information is not provided to indicate the level of participation of GSU students in the job fair. It is reported that 247 students from four schools did attend the fair and 25 employers were available. We do not know how many of these students were from GSU, how much the program cost, and even more important, how many students were hired by the participating companies. Consequently, the absence of this and other information presents an informative and summary evaluation of this and similar job fair information regarding the effectiveness. Likewise, information regarding the effectiveness of the alumni outreach program is not provided. In fact, I have never been provided with information which describes the program procedures nor has information been made available to me regarding any job placements which have resulted from this activity. The total number of credentials forwarded is reported. I do not know, however, from the self-evaluation how many new credential files were established by students during this twelve month period, how many alumni remain active, or how many persons requested their credentials to be forwarded. This kind of empirical information is minimally necessary in order to evaluate program effectiveness and to help determine the future resource requirements of the unit. I currently do not have this information. More importantly, that information which is provided is quantitative and descriptive only. There has been no effort to provide any assessment/evaluation or inferred recommendations regarding the unit's programs and activities."

The next four pages of Collins' evaluation address Stacy's peer evaluations. That analysis provides, in part:

"Each of the three internal evaluators selected by the Director provided an overall evaluation of the Director's performance in the following order:

1. Poor 2. Excellent 3. Fair

A great deal of weight was given to the first internal evaluator because of the close working relationship on a frequent basis * * *."

and concludes:

"In conclusion, a great deal of weight was given to the evaluation comments of the one internal evaluator selected by the Director, who indicated a close work relationship on a frequent basis. These comments were most relevant because these statements related to the goals of the work plan agreements and the responsibilities of the Director. Cited were statements related to the

performance of on-campus interviews, workshops, and job development. While the evaluation statements of external persons, and those persons selected by me provided information, they were not accorded as much weight because of the occasional[ly] frequency of their work relationship with the Director."

The final two pages of Collins' evaluation consist of Collins' own evaluation. He observed that Stacy had engaged in "consistent behavioral incidents that were unprofessional, uncooperative, and unresponsive." Collins concluded:

"The information reported in the self-evaluation confirmed what I had suspected regarding the performance of the Director. The self-evaluation reflects the low volume of activity in many of the functional areas of responsibility. A low degree of effort is reflected in the volume of appointments with students, employers, and faculty, and the effectiveness of the effort is not addressed. This assessment is consistent with comments by an internal evaluator selected by the Director, who was the only member of the peer evaluation pool who indicated closely working with the Director, often. I am also concerned regarding the performance of responsibilities which violate an agreement with the UPI to refer students needing career counseling to the counseling area of Student Development. Meetings were held with a representative of the UPI to inform the Director of this agreement. A meeting was held with Dr. Diane Kjos, counseling staff, to develop a student referral process. Performance of these counseling duties was not done in a single incident, but rather occurred many times.

In addition, I must also note consistent behavioral incidents that were unprofessional, uncooperative, and unresponsive. One example which supports the charge of unprofessional behavior is her failure to assist in the final preparation of her FY 87 unit budget. Mrs. Stacy submitted a proposed budget submission and it was found to be unacceptable. In an attempt to meet with her on the Friday of the designated week, I telephoned the Career Planning and Placement Office for the purpose of meeting with her and received the message that she had left for the day. Neither my secretary nor I received a message of the fact she would be leaving the University, and Mrs. Stacy had not completed an official vacation request for that day. Her absence made it necessary for me to develop the FY 87 Career Planning and Placement budget. The official Career Planning and Placement budget was allocated on July 1, 1986, as requested. However, it should be noted that Mrs. Stacy expended her total travel allocation, has spent the total contractual allocation of $2,000 and had a $312 deficit, and her commodities line had been expended from a level of $850 to $321. The majority of her allocated budget had been expended in the period of the first four months of the budget year. An incident which supports my charge of uncooperativeness was her refusal to provide me with detailed information regarding the alumni outreach program. On December 16, 1983, I sent Mrs. Stacy a memo requesting detailed information regarding this program after reading an article in the Alumni News

which announced the existence of the program. I had not been informed that such a program was being developed or initiated, and therefore, I requested further information regarding its operation. On January 9, 1987, Mrs. Stacy responded to my December 16, 1986, memo and stated, 'be advised that the Office of Career Planning and Placement neither wrote the article nor generated the headline. If you have a concern, I would suggest that you speak with the author of the article.' To date, I have not received any information from Mrs. Stacy regarding the operational details of this program; yet she cited it as an operational activity in her self-evaluation. In support of my charge of unresponsiveness, I cite the example of her failure to respond to my request to develop a written description of the programs and activities of the Career Planning and Placement unit. On June 13, 1986, another memo was sent to her requesting this information and again received no response. After not receiving a response to these two requests, I formally assigned this responsibility to her as a part of her work plan agreement for 1986-1987. Since formally assigning this responsibility as part of her work plan agreement, I have attempted to discuss the matter in our scheduled individual meetings, but received no information regarding the progress of this activity. Yet, in her self-evaluation, she states that this activity should be a goal for 1987-1988.

Based on her failure to perform her assigned duties, which is manifested in the low volume of activity, low degree of performance efforts, the failure to assess the effectiveness of efforts, consistent incidents of unprofessional, uncooperative and unresponsive behavior that detracts from the performance of assigned duties and goals, I am making the following recommendation:

*Recommendation:*

I recommend that Mrs. Sandra Stacy not be retained in the position of Director of Career Planning and Placement at Governors State University."

Stacy acknowledged receipt of this document on March 4, 1987. Claimant indicated that she wanted to file a grievance of the non-retention recommendation. She didn't actually fill out a grievance because, according to the handbook, she was supposed to try to settle the situation without an official grievance *per se*. She expected the situation would follow the grievance procedure outlined in the GSU handbook.

"The grievance procedure provides, in part:

In appeals of decisions to terminate an administrative employee, the obligation of the Administrative and Professional Grievance Committee is to limit itself to reviewing the process through which judgment and recommendations have been made to determine if they have been made fairly and in accordance with unit, University and Board policy and procedures. The Committee will not substitute its judgment for that of the appropriate administrator as to

the quality of performance or any other substantive matters contained in the termination. Appeals of terminations for cause are handled under the provisions of BOG *Regulations* 11.B. A record of this appeal will be retained in the individual's personnel file."

Stacy understood that the handbook grievance procedures were not intended to deal with the "facts of the non-retention recommendation * * *." She realized that the grievance committee could not change the substantive recommendation. Stacy felt that the recommendation process had to stop at some point if she filed a grievance.

According to Stacy, there were three failings in her 1987 evaluation/grievance process: (1) the dates set out in the handbook were not followed, (2) the tapes of her grievance hearing were not destroyed, and (3) she was treated like "an invisible person."

On March 12, 1987, GSU's provost wrote to the university president to point out certain internal conflicts in the GSU handbook. Stacy was advised about the conflict but she had been aware of it way back in February of 1986.

On March 13, 1987, the president wrote to Stacy:

"I recognize a conflict of time schedules for the evaluation process and the grievance process. Therefore, in the event you initiate formal proceedings and in order to assure you of fair and equitable treatment within the parameters of the grievance procedures, I will suspend the March 31, deadline for my notification of a retention or non-retention decision until ten (10) days after receipt of the findings and recommendations of the Administrative and Professional Grievance Committee."

Stacy thought the president's response was the best he could do at that time.

After the president's March 13, 1987, memorandum, Stacy proceeded with the grievance procedures outlined in the handbook.

On March 20, 1987, she wrote a memorandum to Dean Taylor asking for a meeting to discuss her grievance.

On March 20, 1987, Stacy met with Collins. That meeting with Collins lasted about five minutes and took place at Collins' office. Stacy recalls telling Collins that she wanted to discuss the possibility of working the situation out. She recalls that Collins told her that there was nothing to talk about and that he was not going to change his mind.

Dean Taylor was out of town when Stacy asked for her meeting. Ms. Suzanne Prescott was designated to serve as Dean Taylor's proxy in a meeting with Stacy. Stacy's meeting with Ms. Prescott was very short. During that meeting, Stacy introduced herself, told Prescott that she had already visited Collins with no success and that she was, therefore, meeting with the next highest administrator. Ms. Prescott told Stacy that she was not in a position to work things out and the process went forward from there. This meeting took place on Friday, March 27, 1987, at 9:00 a.m. and was later memorialized in a memorandum prepared by Ms. Prescott.

On April 2, 1987, Provost Curtis wrote to the chairperson of GSU's Administrative and Professional Grievance Committee. He advised the chairperson that Stacy wanted to grieve a non-retention recommendation and explained how Stacy's supporting materials would be provided to the committee chairperson.

A few days later, the committee chairperson, Thomas W. Call, wrote to Dean Taylor and Collins advising them that the Professional Grievance Committee had received a formal grievance from Stacy and asking them to prepare a written response to Stacy's grievance within five working days. On April 5, 1987, Dean Taylor and Collins responded in writing to Stacy's grievance. This written response includes a "chronology of events" relating to Stacy's 1987 performance evaluation.

Chairperson Call sent Stacy a copy of Dean Taylor's and Collins' written response on April 17, 1987. In addition, Chairperson Call scheduled a hearing for May 4, 1987, at 10:00 a.m. in the GSU administrative conference room.

The grievance hearing was held as scheduled. Stacy admits that her peers who served on the hearing committee provided a full opportunity for her to talk, explain her view, and to cross-examine witnesses. She also admits that, after the grievance hearing, the committee decided that GSU's handbook had not been violated. A copy of the tape-recorded hearing is submitted. Stacy expressly objects to the relevancy of trial exhibit 52 and the Court sustains that objection.

On May 8, 1987, Chairperson Call wrote to President Goodman-Malamuth concerning the findings and recommendations of the grievance committee. The committee found:

"Having reviewed the materials submitted by the grievant and the respondents Ms. Taylor and Mr. Collins, and having heard their testimony on May 4, 1987, it is the opinion of the Committee that the evaluation process which led to the non-retention recommendations was fair and did not violate the spirit and intent of the University Administrative and Professional Personnel Policy."

The board has delegated to President Goodman-Malamuth non-retention decisions. The president is the final decision maker.

On May 15, 1987, President Goodman-Malamuth wrote to Stacy by certified mail, return receipt requested, advising her that he had reviewed the findings of the Administrative and Professional Grievance Committee and concurred with their recommendation that Stacy's grievance be denied. The president further provided Stacy with six additional months of employment with a termination date set for November 18, 1987. Stacy's husband

signed for this letter on May 20, 1987. Shortly thereafter, she read the letter and understood the president's decision.

In making his decision whether or not to terminate Stacy, President Goodman-Malamuth, allegedly using his academic judgment, relied on a number of factors including the recommendations of the unit head (Collins), the dean (Taylor), the provost (Curtis), Stacy's responses thereto, and the findings and recommendations of the Administrative and Professional Grievance Committee. The findings and recommendations of the Administrative and Professional Committee were done pursuant to its charge which states:

"In appeals of decisions to terminate an administrative employee, the obligation of the Administrative and Professional Grievance Committee is to limit itself to reviewing the process through which judgments and recommendations have been made to determine if they have been made fairly and in accordance with unit, University and Board policy and procedures. The Committee will not substitute its judgment for that of the appropriate administrator as to the quality of performance or any other substantive matters contained in the termination."

## The findings were:

"The Administrative and Professional Personnel Grievance Committee has considered the grievance filed by Ms. Sandra Stacy contesting the non-retention recommendation issued with her annual performance evaluation. Having reviewed the materials submitted by the grievance and the respondents Ms. Taylor and Mr. Collins, and having heard their testimony on May 4, 1987, it is the opinion of the Committee that the evaluation process which led to non-retention recommendation was fair and did not violate the spirit and intent of the University Administrative and Professional Personnel Policy.

The Committee finds that the processes related to the annual evaluation of performance, as defined in the Administrative and Professional Personnel Handbook (Section VI, Evaluation of Performance), did occur, although not in all cases in strict accordance with published time frames in development of work plan opinion of the Committee, these deviations had no impact upon the decisions made in the process and did not adversely affect the grievant.

Based upon information submitted by both the grievant and respondents, the Committee concluded that measurable goals and objectives were established, and that these goals formed the basis for evaluating Ms. Stacy's developing the work plan and that due process was afforded her throughout this process."

The Recommendation was:

"The Committee recommends that the grievance be denied."

According to Stacy's evaluation by Collins and Taylor, the president found that Stacy "was not meeting the specifications of her job." Based only on these evaluations, the president "decided that her quality of performance was not up to what was required of her."

Based on everything available to President Leo Goodman-Malamuth, the recommendations of Collins, Taylor, Curtis and the findings and recommendations of the Administrative and Professional Grievance Committee, it was his final decision to uphold the recommendations of non-retention.

Based on the foregoing, President Goodman-Malamuth determined that the termination was not a for-cause termination.

Under the regulations of the Board of Governors, after her non-retention, Stacy was entitled to six additional months of employment as a category A, level IV administrative employee.

GSU's president had previously advised Stacy that he would delay his decision until after the grievance process ended.

According to board regulations, category A, level IV administrative employees are appointed by the president after consultation with appropriate constituencies. All level IV administrative employees of the board are employed by, and serve "at the pleasure of," their respective university presidents. Except for terminations for cause, such employees may be terminated upon written notice of the university president as follows:

"(2) In the second through fifth year of appointment, not later than six (6) months prior to the termination date specified in the notice."

By May, 1987, Stacy was in her second year of employment as a category A, level IV employee. She received the specified six-month notice for termination in cases not involving cause.

Stacy continued to serve the university after her notification from GSU's president. Her employment relationship, however, was not completely satisfactory. For example, Collins asked her to meet with him to discuss her duties and responsibilities. Stacy refused to meet with Collins except on five days notice and with her attorney present.

Finally, on August 10, 1987, Stacy submitted her resignation effective Friday, August 14, 1987. About ten days after her resignation, Stacy began working at a new job at a university located in Platteville, Wisconsin.

At no time during this entire process did Stacy assert that her termination was for "adequate cause" under the Board of Governors' regulations. At no time did Stacy request a termination hearing under the Board of Governors' regulations.

Thomas Layzell, chancellor of the Board of Governors, the chief executive officer of the system of five universities, has stated that the Board of Governors regulations, section 2, faculty administrative & civil service employees were in existence during Stacy's employment and apply to employees like Stacy.

Layzell states that if Stacy was terminated for "cause," Stacy "would have had to have been given a statement of what the reasons were for her dismissal" and that these were not given to Stacy. The regulations of January 17, 1980 ("Conditions of Employment, Subsection [b]") would have had to have been followed for Stacy if she was terminated for cause.

Leo Goodman-Malamuth, president of Governors State University, admits that if Stacy's termination had been for "cause," a different process would have been required and that process was not given to Stacy.

Leo Goodman-Malamuth states that his decision ends the matter, though the employment might continue for awhile.

If an employee such as Stacy is terminated for "cause," then such an employee is entitled by board regulations to the procedures set out in the board's applicable regulations. Those procedures include:

a. at least one meeting with the employee to discuss possible remedial action or settlement;

b. a written statement of the purpose for such a meeting;

c. a notice of intent to seek termination containing a statement of reasons;

d. a right to a form hearing before a committee of five, two of which were selected by Stacy and two by the president with those four to select a fifth;

e. the right to present witnesses and confront and cross-examine witnesses; and

f. the burden of proof on the employer to establish the cause by clear and convincing evidence.

There is no rule, policy or regulation that (a) allows the board to all a "for cause" termination a "not for cause termination" or (b) describes how an agent of the board or GSU is to choose which of the two procedures to follow.

The Board of Governors wrote all the rules, policies and regulations that applied to Stacy and disseminated them to her.

The board avers that Stacy was terminated for reasons other than "cause." [Note: See the board's answer, par. 12.]

The board's regulations define adequate cause as "one or more acts or omissions which, singly or in the aggregate, have directly and substantially affected or impaired an employee's performance or fulfillment of his/her duties."

The regulations apply to Stacy. Stacy read them and understood them.

The grievance process accorded Stacy by the board only reviews whether the appropriate procedures were followed from initial evaluation on up to the review period. The grievance process does not contemplate review of factual misstatements. The grievance panel cannot substitute its judgment for that of the appropriate administrator as to the quality or performance of substantive matters contained in the termination.

After being terminated with six months' notice effective November 18, 1987, which would have been in the middle of a school year, Claimant found a job which started August 24, 1987, and resigned, effective August 14, 1987, due to her "being fired * * * and my need to seek new employment" so that she could move to Platteville, Wisconsin, site of her new job.

Based on the evidence, we find that Claimant was not terminated for cause and Claimant did not receive the hearing required for a termination for cause. The Claimant would prevail unless there was another valid method to terminate Claimant's employment. When Claimant signed her contract, she received the *Governors State University Administrative and Professional Personnel Handbook*. The Respondent and Claimant both acted

as though the handbook was a part of Claimant's employment contract by participating in the evaluation procedures and grievance procedures.

It is also clear that the handbook's provisions on evaluation and termination are not contrary to, or inconsistent with, the governing policies and regulations but merely supplement the general policies and regulations. Claimant understood that after January 1, 1986, her employment evaluations were subject to the handbook. In February, 1987, Claimant prepared a self-evaluation pursuant to the handbook.

When the non-retention recommendation was made by Mr. Collins, Claimant did not fill out a grievance because, according to the handbook, she was supposed to try to settle the situation without an official grievance. Claimant expected the situation would follow the grievance procedure outlined in the GSU handbook. Claimant proceeded with the grievance procedure outlined in the handbook after the president's March 13, 1987, memorandum. Claimant filed a formal grievance in regard to the non-retention determination. Claimant's peers who served on the hearing committee provided a full opportunity for Claimant to talk, explain her view, and to cross-examine witnesses. The board had delegated to the president non-retention decisions. On May 13, 1987, the president of the university wrote to Claimant and advised her that he had reviewed the findings of the Administrative and Professional Grievance Committee and agreed with their recommendation. The president also provided Claimant with six additional months of employment with a termination date of November 18, 1987.

The parties have stipulated that based on everything available to President Goodman-Malamuth, the recommendations of Collins, Taylor, Curtis, and the findings and

recommendations of the Administrative and Professional Grievance Committee, it was the president's decision to uphold the recommendation of non-retention. President Goodman-Malamuth determined that the termination was not a for cause termination. The parties have stipulated that Claimant was a category A, level IV administrative employee and that all such employees are appointed by the president after consultation with appropriate constituencies. All persons at that level are employed by, and serve at the pleasure of, their respective university presidents. Except for terminations for cause, such employees may be terminated upon written notice of the university president. Such persons as Claimant, in their second through fifth year of employment, receive six months notice of termination. Claimant received the specified six-month notice of non-retention. Claimant submitted her resignation on August 10, 1987, and started a new job about ten days later.

Claimant argues that this was really a for cause termination, that Claimant did not receive the proper hearing for a for cause termination, and that Claimant should be reinstated and be awarded back pay. We disagree. Claimant's administrative position as Director of Career Planning and Placement in the Office of Student Development at GSU was specifically subject to the governing policies and regulations of the Board of Governors of State Colleges and Universities *and* Governors State University policies and procedures. Based on the stipulation and exhibits, we find that the ending of Claimant's employment was a properly executed non-retention. Claimant served at the pleasure of the president of the university. After review of Claimant's evaluations, the president chose not to retain Claimant in her administrative position. Claimant received the required six months' notice.

There is an obvious distinction between a for cause termination and non-retention. If the university had

wanted to terminate Claimant immediately without further pay, they would have had to prove cause and give Claimant the required for cause termination hearing. This they did not do. Instead, pursuant to the terms of Claimant's employment, the university chose not to retain Claimant pursuant to the non-retention provisions and gave her six months' notice.

The non-retention provisions were part of Claimant's employment package which she knew about when she accepted the position. She knew she could be out of a job at any time with certain notice, depending on the pleasure of the president. This is the employment Claimant accepted. The Respondent and Claimant followed the procedures for a non-retention grievance and while the Claimant does not appreciate the result, we find the non-retention was proper. Claimant had no right to continued employment beyond the pleasure of the president of the university. *Stone v. State* (1975), 31 Ill. Ct. Cl. 126.

Claimant has the burden of proving by a preponderance of the evidence that she had contractual and/or due process rights which were different than those afforded to her by the Respondent prior to her resignation. The Claimant must also prove that such contractual or due process rights were violated by Respondent and that she suffered damages thereby. For the reason that Claimant did resign, a threshold question concerning the voluntariness of the resignation must be addressed prior to considering any other issue. If the Claimant's resignation was voluntary and not coerced, she cannot recover and we do not reach the issues as to contractual or procedural rights, a violation of those rights and damages.

There is no question from the evidence that Claimant resigned. If the resignation was voluntary by this public employee, then it was effective and binding for all

time when received by Respondent. (*Weber v. Board of Fire and Police Commissioners* (1990), 204 Ill. App. 3d 358; *Stearns v. Board of Fire and Police Commissioners* (1978), 59 Ill. App. 3d 569.) "When one voluntarily submits a resignation, he thereby divests himself of any legal interest in his former employment." *Whitaker v. Pierce* (1976), 44 Ill. App. 3d 148.

We recognize that a resignation can be involuntarily coerced and therefore legally equivalent to a discharge. When a person is severed from his employment by coercion, the severance is effected by the supervisor and not by the will of the employee. A person forced to resign is in reality discharged and not a person who exercises his own will to end his employment voluntarily. (*Piper v. Board of Trustees* (1981), 99 Ill. App. 3d 752.) The issue is whether Claimant's judgment was merely influenced or whether her mind was so dominated by Respondent as to prevent the exercise of an independent judgment. (*Piper, supra,* at 758.) If an individual's will was overborne or if his resignation was not the product of a rational intellect and free will, then his resignation is a discharge. The question of whether a resignation is voluntary depends on the circumstances under which it is made.

From a thorough review of the evidence in this case, we find that the Claimant has failed to prove that her resignation was involuntary, coerced or the product of duress.

Because the non-retention was valid under the procedures of the university, Claimant was not pressured or coerced into resigning. She could have worked the last six months and received a full six months of remuneration. From the record, it appears Claimant voluntarily accepted employment elsewhere before the end of the six-month period to further her career.

Claimant also had the burden of proving a breach of contract. Based on the evidence, we find the non-retention was proper, Claimant was not wrongfully discharged, and her due process rights were not violated. *Maher v. State* (1976), 31 Ill. Ct. Cl. 137.

The Claimant accepted a position with a term at the pleasure of the president. That position required six months' notice of non-retention. Claimant received that notice as she was entitled. The Claimant argues the Court should find that Claimant's non-retention was in reality a faulty termination for cause. This we cannot and will not do because Claimant was offered the six months' notice of non-retention as required.

For the foregoing reasons, it is hereby ordered that this claim be and hereby is dismissed.

## ORDER

FREDERICK, J.

This cause comes before the Court on Claimant's motion for rehearing, and the Court having reviewed the court file, all pleadings, testimony, the response to the petition, the reply to the response, and the Court's opinion, and the Court being fully advised in the premises, wherefore, the Court finds:

1. That nothing presented by Claimant leads the Court to believe its opinion was erroneous in any way.

2. That the Court's opinion of September 15, 1995, was the proper decision.

Therefore, it is ordered that the petition for rehearing is denied.